**UNITED STATES of America**

v.

**Pasquale Vincent BORGESE et al., Defendants.**

United States District Court
S. D. New York.
Nov. 9, 1964.

Robert M. Morgenthau, U. S. Atty. for the Southern District of New York, for the United States; Andrew J. Maloney and John R. Bartels, Asst. U. S. Attys., of counsel.

Edward Bennett Williams and Vincent J. Fuller, Washington, D. C., for defendant Pasquale Vincent Borgese.

WYATT, District Judge.

These are two motions, and two further motions in the alternative, for defendant Borgese, who is charged (along with three other defendants) in an indictment of 38 counts. Borgese is named in each of the counts.

The first count is for conspiracy (18 U.S.C. § 371) to violate 18 U.S.C. § 1084 ("transmission of wagering information") and 18 U.S.C. § 1952 (use of facility in interstate commerce "in aid of racketeering enterprises"). Counts 2 through 36 charge Borgese and one or another of the other defendants, or Borgese alone, with substantive violations of 18 U.S.C. § 1084 or 18 U.S.C. § 1952. Count 37 charges Borgese with failure to pay the special tax related to wagering (26 U.S.C. §§ 4401, 4411, 7262). Count 38 charges Borgese with failure to register in respect of his alleged wagering (26 U.S.C. §§ 4401, 4411, 4412, 7203, 7272).

The motions for Borgese are (A) under Fed.R.Crim.P. 41(e) for the return and suppression as evidence of certain property (including in this term transcripts of overheard conversations) and (B) under Fed.R.Crim.P. 12 (1) to dismiss all counts of the indictment because it was procured by evidence unlawfully obtained (2) to dismiss counts 1 through 36 on the ground that 18 U.S.C. §§ 1084 and 1952 are unconstitutional (3) to dismiss counts 7 through 10, 17 through 21, 28 through 30 and 34 through 36 on the ground that these counts do not set forth an offense, and (4) to dismiss count 38 for "duplicity" in that it is said to charge a violation of two separate provisions and further that compliance with such provisions would violate constitutional rights of defendant (this last motion has not been pressed).

The motions for Borgese in the alternative (that is, if the indictment be not dismissed) are (c) under Fed.R.Crim.P. 7(f) for a bill of particulars, and (D) under Fed.R.Crim.P. 16 for discovery and inspection.

A. Motion for return of property and to suppress evidence under Fed.R. Crim.P. 41(e)

1.

It is undisputed in the affidavits that for a period prior to the indictment government agents, by the use of scientific devices, overheard conversations of Borgese. A small radio transmitter was placed from time to time by the agents in various unoccupied public coin operated telephone booths. Thereafter Borgese, as expected by the agents, used these telephone booths to make telephone calls. His words were picked up by the device concealed in the booth and were by it transmitted through the air to a receiving device not far away, where agents overheard what Borgese said and recorded or made notes of it. The government represented in affidavits that only what Borgese said in the booth was overheard and not what was said by the other party or parties to the conversations.

The same technique was employed by the government agents to overhear and record conversations of Borgese in a public restaurant (in such instances the conversation of all parties present, as well as Borgese, was presumably overheard).

The present motion to suppress is based on the contention that the eavesdropping of the agents was in violation

of 47 U.S.C. § 605 and of the rights of Borgese under the Fourth and Fifth Amendments.

So far as 47 U.S.C. § 605 is concerned, a violation would occur if by any sort of device, however placed with reference to the telephone, the agents overheard the telephone conversation (including the words of the *other* parties to the conversations with Borgese) and later divulged or used them. Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937); United States v. Hill, 149 F. Supp. 83, 84–85 (S.D.N.Y.1957).

On application of defendant Borgese, the Court received evidence at a hearing on the issue whether the eavesdropping device employed by the agents was such that they could hear the *telephone* conversation (that is, what was said by all parties to it) or whether (as the government contended) the device picked up the words of Borgese, not from or through the telephone, but from the air inside the telephone booth.

The Court had this hearing on September 23, 1964, (at which defendant Price, having a similar motion, was also represented) to receive evidence as to the physical means employed by the government agents to overhear the conversations, especially whether both sides of the conversations were overheard or only the words of movant Borgese. All government agents involved in the particular surveillance testified. A further hearing was held on November 6, 1964 to permit further cross-examination (on the basis of material ordered under 18 U.S.C. § 3500 delivered to movant) of one of the agents. The testimony of the agents establishes that small radio transmitters (trade name "Kel" or "Fargo") were placed in public telephone booths while the booths were unoccupied; generally the devices were attached by magnetic attraction to the underside or one of the sides of the bell box under a shelf at the lower end of the telephone apparatus but sometimes were otherwise fastened to the bell box and on one occasion a device was placed in the lighting fixture in the top of the booth; that there was no entry into or interference with the telephone apparatus but only a use of an exterior wall thereof as a support for the transmitter; that the telephone company was not advised of the activities indicated and no specific consent was secured from it; that the telephone booths had doors which could be closed from the inside and that generally Borgese closed the door but occasionally left it open; that the transmitter could not transmit any part of the telephone conversation itself but could only transmit sounds from within the booth; that no part of the conversation of those to whom movant Borgese spoke was transmitted; that these sounds were transmitted by radio to a receiver operated by the agents a short distance away; that there were several types of portable receivers which could receive the transmitted words of Borgese within a range of 100 to 150 feet or about a third of a block; the receiver in the automobile of the agents could also receive the overheard words and its range was presumably greater but is not shown by the record; that the devices were left in the phone booths for less than 15 minutes except in one instance when it was left for two hours; that, while it was technically possible to overhear the words of anyone entering the booths where transmitters had been placed, no words were actually overheard from the booths except those of Borgese; that over 95% of the overheard words of Borgese related to the subject under investigation by the agents but some words of his were overheard which related to other matters; and that none of the overheard words of Borgese indicated that he was talking to his lawyer.

It must first be determined whether on the facts established there was a violation of 47 U.S.C. § 605.

█ The words of Borgese were picked up by the radio transmitter, not from the telephone, but from Borgese himself. It is the same—so far as the statute is concerned—as if the agents had stood outside the telephone booth and there heard Borgese's voice. Goldman v. United States, 316 U.S. 129, 133–134, 62 S.Ct.

993, 86 L.Ed. 1322 (1942). 47 U.S.C. § 605 makes it unlawful to "intercept" a telephone "communication". The decision in Goldman, above, was that overhearing words spoken into a telephone was not to "intercept" a "communication". The Court said (316 U.S. at 133, 62 S.Ct. at 995):

"Words spoken in a room in the presence of another into a telephone receiver do not constitute a communication by wire within the meaning of the section."

It seems reasonably clear that in the case at bar there was no violation of 47 U.S.C. § 605.

■ The contention is also made for movant Borgese that use of the radio transmitter to transmit the words of Borgese (a) required a license of the Federal Communications Commission (47 U.S.C. §§ 301, 307) and (b) required that the operation of the radio transmitter be in accordance with administrative rules of the Federal Communications Commission.

Admittedly there was no license for the use of the radio transmitters here. The movant argues that there was thus a violation of law and that evidence obtained thereby should be suppressed. It would seem most remarkable if the use of radio by federal agents as an investigative aid required a federal license. The short answer is that 47 U.S.C. § 305 specifically exempts government "radio stations" from any licensing requirement. Mr. Kiser, Engineer in charge of the New York area for the Federal Communications Commission, testified at the November 6, 1964 hearing that any radio transmitter is a "radio station" and this would be my conclusion even without such testimony.

■ As for the administrative rules of the Federal Communications Commission, movant has asked for a hearing so that violations of such rules may be established. This request is denied because even if the administrative rules were violated, it would not affect the motion to suppress.

■ The licensing provisions of the statute and the administrative rules of the Commission (which deal with such matters as frequencies to be employed, length of operation, etc.) regulate radio transmission in the public interest to avoid interference of signals, overcrowding of the air waves and the like conditions. There is nothing in any of this to create any right of privacy or any special protection for movant Borgese as a user of a telephone. This statutory and administrative regulation is thus unlike 47 U.S.C. § 605 where Congress obviously meant to protect users of telephones against the specified invasion of their privacy as individuals.

Finally it may be noted that it appears without dispute from the affidavit of Mr. Kiser (repeated from the witness stand at the November 6, 1964 hearing) that frequencies for federal investigative agencies are assigned by the "Inter-Agency Radio Advisory Committee" and that such "was done in this case." The committee referred to is composed of representatives of a number of government agencies, including the military and including a representative of the Federal Communications Commission.

The arguments for movant Borgese based on claimed violations of radio licensing requirements and administrative regulations as to radio frequencies, etc. are believed to be without merit.

■■ The New York laws against eavesdropping are broader than 47 U.S.C. § 605. Penal Law, § 738(1), McKinney's Consol. Laws, c. 40 makes it unlawful to overhear "a telephone * * * communication" and, applying the reasoning of Goldman, there was no violation by the agents of this provision. But Penal Law, § 738(2) goes further and also makes it unlawful "by means of an instrument" to overhear "a conversation or discussion". Clearly the overhearing of a conversation of Borgese and his companions in a public restaurant was within the terms of Penal Law, § 738(2). As to the words of Borgese in the public telephone booths, they were only a *part* of "a con-

versation or discussion" and it would seem that no "conversation or discussion" was itself overheard, this because it takes words from more than one person to constitute a "conversation or discussion". The dictionary (Webster's Third New International, p. 498) in defining "conversation" speaks (among other things) of an "oral *exchange*" (emphasis supplied) and of "colloquial discourse". While the point is doubtless a very narrow one, I am inclined to believe that the agents did not violate Penal Law, § 738(2) by overhearing the words of Borgese in the public telephone booths.

■ But assuming that Penal Law, § 738(2) was in fact violated, this would not mean that the motion to suppress must be granted. The general principle is that evidence obtained by a violation of state law is not thereby inadmissible in a federal court. Olmstead v. United States, 277 U.S. 438, 468–469, 48 S.Ct. 564, 72 L.Ed. 944 (1928); On Lee v. United States, 343 U.S. 747, 754–755, 72 S.Ct. 967, 96 L.Ed. 1270 (1952); Ferguson v. United States, 307 F.2d 787, 789–790 (10th Cir. 1962), on motion of the United States, judgment vacated on other grounds and case remanded, 375 U.S. 962, 84 S.Ct. 479, 10 L.Ed.2d 413 (1964). The Olmstead case dealt with the kind of wiretapping, not present in the case at bar, which today would be a violation of 47 U.S.C. § 605—doubtless enacted because of the Olmstead decision and the influence of the powerful dissent in that case of Mr. Justice Brandeis. The wiretapping in Olmstead, while not then a violation of federal law, was a violation of state law. A majority of the Supreme Court held the evidence nonetheless admissible in a federal court. It is true that Mr. Justice Brandeis in dissent relied heavily on the violation of state law but not as itself establishing inadmissibility; he relied on violation of state law to show the immoral and socially undesirable character of the conduct involved; in fact, he cited for this purpose not merely the statutes of the state where the conduct occurred but the statutes of many states prohibiting such conduct.

■■ The case at bar is unlike Olmstead because there has been no "wiretapping" such as was there involved. Moreover, the laws of New York expressly permit state law enforcement officers to do what was done here, if they secure an ex parte order authorizing it (Code of Criminal Procedure, § 813–a). To secure such an order, the only showing necessary is "that there is reasonable ground to believe that evidence of crime may be thus obtained". New York does not contemplate, however, that *federal* agents will secure such an order. The order is issued on the "oath or affirmation of a district attorney, or of the attorney-general or of an officer above the rank of sergeant of any police department of the state or of any political subdivision thereof." (Code of Criminal Procedure, § 813–a). These are apt descriptions of state or city officials but not of agents of the national government. There is thus no procedure by which *federal* agents could obtain from New York the ex parte order authorized for *state* law enforcement officers. This must be because the New York legislature did not contemplate that the propriety of the activities of *federal* law enforcement officers was to be attempted to be regulated by the state. In any event, the admissibility of evidence in a federal court cannot depend on the presence or absence of an ex parte order signed by a state judge. The important thing for present purposes is that New York does not condemn eavesdropping by state law enforcement officers but expressly permits it. Thus, there is nothing immoral (as judged by declared policies of New York) in what the federal agents did here. The argument for Borgese based on an alleged violation of New York law is not convincing.

We turn now to the question whether, aside from any claimed violations of New York law and of specific federal statutes or administrative rules, there was any violation of the constitutional rights of the movant Borgese.

■ The Fifth Amendment could only be applicable as a "due process" requirement if the Fourth Amendment

was first violated. There is no self-incrimination problem in the case at bar because there was never any compulsion on Borgese to use the telephone booth or to talk in restaurants. See Olmstead v. United States, above 277 U.S. at 462, 48 S.Ct. 564. It has been said that "the Fourth Amendment is complementary to the Fifth" (Mr. Justice Brennan, dissenting in Lopez v. United States, 373 U.S. 427, 455, 83 S.Ct. 1381, 1396, 10 L.Ed.2d 462 (1963)).

 It must be determined, therefore, whether what was done was an "unreasonable" search and seizure in violation of the Fourth Amendment.

The Fourth Amendment protects the people "in their persons, houses, papers, and effects, against unreasonable searches and seizures".

In Goldman v. United States, above, the agents had gone into a room adjoining the office of a defendant. They had placed a delicate receiver "against the partition wall" and thus overheard what was said in defendant's office, including his conversation into a telephone. The use of the overheard words against defendant was held to be no violation of the Fourth Amendment. The single dissent emphasized that the Fourth Amendment prevented the government from "invading the sanctity of a man's home or his private quarters" (316 U.S. at 137, 62 S.Ct. at 997).

In Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961), the agents took up position in a row house adjacent to "the house occupied by the petitioners" (365 U.S. at 506–507, 81 S.Ct. at 680). They used a microphone with a spike which they drove into the party wall until it hit the heating duct of "the house occupied by the petitioners"; they were then enabled to hear conversations in that house, including the end in that house of telephone conversations. The Court expressly refused to consider the broad question of invasion of privacy or to reconsider its Goldman decision. The eavesdropping was held to be a violation of the Fourth Amendment

on the specific and limited ground that it was "accomplished by means of an unauthorized physical penetration into the premises occupied by the petitioners" (365 U.S. at 509, 81 S.Ct. at 681). Again the "home" aspect was stressed. The Court emphasized "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion" (365 U.S. at 511, 81 S.Ct. at 683). The concurring opinion of Mr. Justice Douglas referred to the "intimacies of the home" and asserted that the "sole concern" of the Court "should be with whether the privacy of the home was invaded" (365 U.S. at 513, 81 S.Ct. at 683).

The most recent reference by the Supreme Court to the earlier cases seems to have been in Lopez v. United States, 373 U.S. 427 at 438–439, 83 S.Ct. 1381 at 1387–1388, 10 L.Ed.2d 462 (1963) where the opinion states:

> "The Court has in the past sustained instances of 'electronic eavesdropping' against constitutional challenge, when devices have been used to enable government agents to overhear conversations which would have been beyond the reach of the human ear. See, e. g. Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944; Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322. It has been insisted only that the electronic device not be planted by an *unlawful physical invasion of a constitutionally protected area*. Silverman v. United States, supra." (Emphasis supplied)

In this instance there seems to have been no "unlawful physical invasion". The agents went into the telephone booth when it was unoccupied and when it was freely open to the public. In leaving the devices in the booth, no more was done to disturb the property of the telephone company than would be done, for example, by sticking a wad of chewing gum to the outside of the instrument and later removing it. The one instance of the use of a light fixture is de minimis; even

in that one instance no harm is shown to have been done to the fixture; it remained exactly as before.

Nor does a public telephone booth seem to be a "constitutionally protected area", the expression used in Lopez v. United States, above.

The area in which privacy is guaranteed by the Fourth Amendment is essentially the "houses" of the people, extended to include their offices. For example, it has been said: "a distinction might be drawn between surveillance of home or office on the one hand, and surveillance of public places, streets, and so forth, on the other hand" (Mr. Justice Brennan, dissenting, in Lopez, above 373 U.S. at 466, 83 S.Ct. at 1402 (footnote)). And the emphasis of an argument to outlaw virtually all eavesdropping seems to have been placed on "private homes and offices" (Williams, The Wiretapping—Eavesdropping Problem; A Defense Counsel's View, 44 Minn.L.Rev. 855, 864 (1960)).

In his historic dissent in Olmstead, Mr. Justice Brandeis laid emphasis on the violation of "the most intimate occurrences of the home" (277 U.S. at 474, 48 S.Ct. at 571).

No decision has been found in this Circuit as to constitutional rights in public telephone booths.

Movants call attention to United States v. Stone, 232 F.Supp. 396 (N.D.Tex.1964) where the facts appear to be in substance the same as in the case at bar and where it was said to be "clear" that there was a violation of the Fourth and Fifth Amendments. This conclusion seems by no means "clear". Two unreported district court decisions reach a conclusion contrary to Stone. United States v. Swann, June 28, 1963 (D.D.C.); United States v. DeFusco, October 2, 1961 (D. R.I.). In accord with Stone is a decision of the Court of General Sessions of the District of Columbia, United States v. Madison, November 18, 1963, 32 Law Week 2243. With great deference, I am unable to agree with Stone and Madison.

It is suggested in the Stone opinion that a public telephone booth ought to be regarded as a constitutionally protected area because, it is said, an automobile and an occupied taxi have been so regarded. Supreme Court decisions are cited to support this proposition. The automobile decision is Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959) where the search of the automobile was incident to an arrest without warrant and the sole issue was whether there was probable cause for the arrest or not. The taxicab decision is Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960) where again the search was incident to an arrest without warrant and the sole issue was whether probable cause existed for the arrest. In neither decision was there any discussion of the "area" of the search nor any consideration whether an automobile or taxi is like unto a home and thus a place where privacy ought to be, and is, protected.

There seems no sure way to determine how the Supreme Court would decide the case at bar. The Goldman and Lopez decisions, above, look one way; Silverman v. United States, above, may look the other.

In such a situation, decision by this Court must depend on a weighing of the need of the individual citizen for protection of this particular kind of privacy as against the need of the national community for effective investigation by federal law enforcement officers. This Court feels that the community need should be paramount and that law enforcement officers ought not to be handicapped by making a public telephone booth (or a table in a public restaurant) into a citadel of privacy.

In this connection, it should be noted that telephone conversations about wagers by a person in the gambling business would not be simply *evidence* of a violation of law; they would be themselves criminal acts. 18 U.S.C. § 1084 makes it unlawful to use a telephone to transmit "wagering information". 18 U.S.C. § 1952 makes it unlawful to use a telephone to carry on "any business enterprise involving gambling". It may

fairly be surmised that a person in the gambling business would use public telephone booths for such business in order to avoid a record of the calls which would necessarily be made if the calls were from a private number.

For the reasons indicated, the motion under Fed.R.Crim.P. 41(e) for the suppression as evidence of the overheard words of Borgese is denied.

### 2.

A warrant for the arrest of defendant Borgese was issued by the Commissioner on a complaint made upon oath by a special agent. At the time of his arrest Borgese was searched and the following items found on his person were seized:

(a) $10,000 in currency; and

(b) "Miscellaneous papers".

A search warrant for the premises at 1223 Weaver Street in New Rochelle (apparently the home of Borgese) was issued by the Commissioner, also on the affidavit of a special agent. The object of the search was "gambling paraphernalia, included but not limited to horse betting slips, baseball and basketball slips, other sporting slips and money" which were said to be used in violation of the wagering tax and registration provisions (26 U.S.C. §§ 4401, 4411, 4412, 7272). Under this warrant the following items were seized at the Weaver Street premises:

(c) $1,000 in currency;

(d) twenty keys;

(e) Consolidated Edison bills;

(f) "papers and ledger sheets"; and

(g) "telephone books".

A similar search warrant, on a similar affidavit, was issued by the Commissioner for premises, Apartment 2–G, 2505 Lorillard Place in Bronx County. Under this warrant the following items were seized:

(h) ten packs of playing cards; and

(i) "one cardboard sheet with red ink writing".

The motion is granted, on consent of the government, as to items (d) and (e).

As to the other items, the chief point made for Borgese is that the showing of "probable cause" to obtain the search and arrest warrant was based on the conversations of Borgese overheard by the agents in alleged violation of the rights of Borgese. This point, of course, cannot survive a finding that the overhearing of the Borgese conversations was not in violation of his rights. Borgese was given an opportunity at the September 23, 1964 hearing to offer anything further as to the validity of the search warrants but his counsel in this aspect stood on the claim as to the overheard conversations, which concededly supplied the probable cause for the warrants.

Borgese further argues that there was no showing before issuance of the warrants that any *offense* was being committed and he points out that 26 U.S.C. § 4411 is a "civil statute" which imposes a tax. The affidavits of the agent, however, refer to 26 U.S.C. § 7272. This section makes it an *offense* to do "any act", etc. without paying the tax. The section also provides for fines and appears in the Code under the heading "Other offenses".

The arrest and search warrants appear to be in all respects valid. It is not necessary, therefore, to determine whether Borgese has standing to question the Lorillard Place search because, assuming he has such standing, the search was proper.

Except as to items (d) and (e) the motion must be and is denied.

### B. Motions to dismiss indictment, or certain counts thereof

### 1.

The motion to dismiss all counts of the indictment because obtained by unlawfully procured evidence is denied for the reasons already given.

### 2.

There is a motion to dismiss counts 1 through 36 on the ground that 18 U.S.C. § 1084 and 18 U.S.C. § 1952 are violative of the First, Fifth, Sixth and Tenth Amendments to the Constitution.

These two sections are part of a program submitted to the Congress by the

Attorney General in 1961 and designed to combat organized crime by making it an offense to use interstate commerce facilities in connection with certain unlawful activities, specifically with reference to the indictment here, gambling activity. See 1961 U.S.Code Cong. and Adm.News, pp. 2631 and following, pp. 2664 and following.

■ The argument that the two sections abridge the "freedom of speech" protected by the First Amendment is without merit. The statutes do not in any way interfere with innocent speech. Section 1084 applies only to a person "engaged in the business of betting or wagering" and if defendant Borgese is in fact engaged in such a business, he is violating the law of New York, as will shortly be seen.

The Constitution of New York (Art. 1, § 9) provides that no "kind of gambling, except pari-mutuel betting on horse races as may be prescribed by the legislature * * * shall hereafter be authorized or allowed within this state". The prohibition against gambling has been in the Constitution for many years; the exception for pari-mutuel betting was adopted by amendment in 1939.

There are numerous statutes in New York which make gambling in its various forms unlawful. For example, see Penal Law, §§ 970–998 inclusive. While a person may not be subject to prosecution merely for making a bet, as Penal Law, § 991 cited in argument seems to indicate, a person in the business of gambling is definitely violating the law of New York and may be prosecuted. See Penal Law, §§ 970, 973, 974, 998. It is interesting to note that effective September 1, 1960, "book-making", as defined by the New York Legislature (which would include accepting large "bets or wagers"), was made a felony. Penal Law, § 986–c. The policy of New York toward gambling is exactly that indicated in 18 U.S.C. § 1084. That policy has recently been summed up in the following description of the gambling laws of New York (Third Interim Report, Temporary Commission on Revision of the Penal Law and Criminal Code,

Legislative Document (1964) No. 14, page 25) :

"The substance of this entire area of legislation, however, is that, no matter what form of gambling is involved, the mere player, contestant or bettor is not criminally liable, but that anyone who, in some capacity other than that of a player, operates, promotes or advances any gambling enterprises or activity is guilty of a crime."

Section 1084 does not apply to the transmission of information respecting bets between states where such bets are legal in both states. It was stated in Congress that this exemption would only apply to information sent to Nevada from another state. 1961 U.S.Code Cong. and Adm.News, pp. 2632–2633. Section 1952 relates entirely to "unlawful activity", including specifically gambling.

■ Congress has undoubted authority respecting interstate commerce and the manner of its exercise to meet an obvious evil is a legislative, not a judicial, determination. The First Amendment is not applicable where criminal conduct is involved. United States v. Smith, 209 F.Supp. 907, 918 (E.D.Ill. 1962).

■ It is contended for Borgese that the two statutes are so vague and uncertain as to violate the "due process" clause of the Fifth Amendment. The same contention has already been presented to and rejected by a number of courts, whose reasoning appears to be entirely sound. Turf Center, Inc. v. United States, 325 F.2d 793, 795 (9th Cir. 1964) ; Bass v. United States, 324 F.2d 168, 173 (8th Cir. 1963) ; United States v. Smith, above 209 F.Supp. at 917–918 ; United States v. Teemer, 214 F.Supp. 952, 956 (N.D. W.Va.1963).

■ It is next contended that Congress had no authority to enact the two sections because in doing so there was no purpose to regulate interstate commerce but rather to "usurp the police power reserved to the states". Gambling, it is suggested, is a matter for local at-

tention by the states under the police power reserved to them by the Tenth Amendment. The answer to this argument was given long ago in the Lottery Case, Champion v. Ames, 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492 (1903) and in the case involving the "white slave" traffic, Hoke v. United States, 227 U.S. 308, 33 S.Ct. 281, 57 L.Ed. 523 (1913). In short, the power of Congress over interstate commerce is so complete that it may adopt any "means" to regulate such commerce either "necessary" or "convenient" and irrespective of the fact that "the means may have the quality of police regulations" (227 U.S. at 323, 33 S.Ct. at 284). Nothing in United States v. Kahriger, 345 U.S. 22, 73 S.Ct. 510, 97 L.Ed. 754 (1953), or the dissents therefrom, can aid Borgese. There, Congress had used the taxing power in relation to activities which—according to the dissent—"substantively are not within the powers delegated to Congress" (345 U.S. at 38, 73 S.Ct. at 518) but the tax was nonetheless upheld by the majority; here Congress is dealing with an activity, interstate commerce, which it has specific authority to regulate.

■■■ The other constitutional contentions for Borgese—for example, the abridgment of travel, unreasonable discrimination, and the like—have all been considered and found to be without merit. The two statutes are clearly directed against unlawful activity involving the use of interstate commerce facilities, a subject as to which Congress has ample authority.

3.

■■■ There is a motion to dismiss counts 7 through 10, 17 through 21, 28 through 30, and 34 through 36 on the ground that these counts do not charge an offense.

These counts are all based on 18 U.S.C. § 1952. This section makes it an offense, among other things, for a person to use a facility in interstate commerce with intent to promote, etc. an "unlawful activity" if thereafter such person "performs or attempts to perform" any of the acts specified in the section.

In the counts here in question, the indictment—after charging use of an interstate facility—avers that Borgese and one of the other defendants "would perform and attempt to perform acts to promote * * * said unlawful activity".

The objection is that the averment "would perform" is not the same as "did perform" or "performed". The objection has some merit. It would be far more precise and certain to charge that defendant "did perform" or "performed". However, the use of "would perform" in the context is not so indefinite as to make the counts defective; they still reasonably advise defendant of what he must be prepared to meet. Particulars are being allowed which in any event meet any complaint for Borgese.

■■■ It is next argued that use of the telephone in interstate commerce is not included in the offenses specified in 18 U.S.C. § 1952. This argument is applied to the case at bar because the counts under Section 1952 charge violations on the same dates as appear in other counts charging violations of 18 U.S.C. § 1084; it is deduced therefrom that the same alleged use of a telephone by Borgese is the basis of a count under Section 1952 and also a count under Section 1084. I will assume that this deduction is correct.

It is my opinion that the language of section 1952, "uses any facility in interstate or foreign commerce", clearly includes the use of a telephone in interstate or foreign commerce.

■■■ Counsel for Borgese do seem right in saying that the original intent of the bill as submitted by the Attorney General and as introduced in Congress was to deal with *travel* only. This appears from the use of the single word "travel" in the bill submitted by the Attorney General and is made clear by his statement before Committees of the Congress. See, for example, Hearings, "Legislation Relating to Organized Crime", Before Subcommittee No. 5 of the House Committee on the Judiciary, 87th Cong., 1st session, Serial No. 16,

pp. 9, 18–26. The bill was amended before passage, however, to add, after the words "whoever travels in interstate or foreign commerce", the words "or uses any facility in interstate or foreign commerce, including the mail". The added words, whatever the motive for their addition, include the telephone as a "facility". Legislative history could not in any event change this plain meaning of the words. See United States v. Smith, above, 209 F.Supp. at 915–917.

▮ It is finally argued for Borgese that if the same conduct violates both Section 1084 and Section 1952, prosecution may be had only under Section 1084 because it carries a lighter penalty. If there be any such rule, this Court is not aware of it. The only authority cited for such a rule is a dissenting opinion in the Supreme Court in a case involving entirely different statutes (Berra v. United States, 351 U.S. 131, 138–140, 76 S.Ct. 685, 100 L.Ed. 1013).

After a trial and sentence on several counts of an indictment, it has been debated in the Supreme Court whether separate punishments may be imposed under separate counts where the same facts support each count but an offense under a separate statute is charged by each count. Gore v. United States, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958).

In Gore, a 5–4 majority in the Supreme Court adhered to the test announced in Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932):

"The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not."

It is premature now to raise any such point in the case at bar because Borgese has not been convicted or sentenced under both Section 1084 and Section 1952 counts; Borges may never be so convicted or so sentenced.

In any event it seems evident that Section 1084 requires proof of different facts than Section 1952, notably because Section 1084 can only be violated by a person "engaged in the business of betting or wagering" whereas Section 1952 is not so restricted.

4.

▮ The motion to dismiss count 38 for duplicity is not referred to in the memoranda of law for movant and is considered withdrawn.

For the reasons indicated the motions to dismiss the indictment and specified counts therein are in all respects denied.

C. Motion for a bill of particulars under Fed.R.Crim.P. 7(f)

The motion is granted as to items 1 and 2, on consent of the government.

The motion is also granted as to item 3 and the United States Attorney is directed to state what act or acts it will be claimed defendant Borgese did perform or attempted to perform.

The motion is denied as to item 4.

D. Motion for discovery and inspection under Fed.R.Crim.P. 16

The motion must be denied as to item 1 under the controlling authority of United States v. Murray, 297 F.2d 812, 820 (2d Cir. 1962). Our Court of Appeals there decided that the wording of present Fed.R.Crim.P. 16 applies only to books, papers, etc. "in which a defendant has had some prior proprietary or possessory interest". The Advisory Committee on Criminal Rules appointed by the Chief Justice has proposed amendments to Rule 16 which specifically authorize the Court to grant defendant a discovery of his own statements (Second Preliminary Draft of Proposed Amendments, etc., March 1964). Unless and until the present wording of Rule 16 is changed, however, I feel obliged to follow the Murray decision. Cf. United States v. Willis, 33 F.R.D. 510, 512–513 (S.D.N.Y.1963).

▮ The motion is denied as to item 2 for lack of a showing that these items

"may be material" to the preparation of the defense (Fed.R.Crim.P. 16).

The motion is granted as to items 3, 4 and 5 on consent of the government (it is assumed that the "examination" to which the government consents, includes copying or photographing).

So ordered.